# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOANN MARY SANCHEZ,**

     **Plaintiff,**

    **vs.**                                        **Civ. No. 16-1160  KK**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner of Social Security,**

     **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>[2]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 18) filed February 16, 2017, in support of Plaintiff Joann Mary Sanchez's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits.  On May 24, 2017, Plaintiff filed her Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 23.)  The Commissioner filed a Response in opposition on June 29, 2017 (Doc. 25), and Plaintiff filed a Reply on August 4, 2017.  (Doc. 26.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration.  Fed. R. Civ. P. 25(d).

[2]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 11, 12.)

# I. Background and Procedural Record

Claimant Joann Mary Sanchez ("Ms. Sanchez") alleges that she became disabled on August 19, 2010,[3] at the age of fifty-three because of back injury, nerve damage, shoulder injury, fibromyalgia, chronic cervical pain, and chronic bursitis. (Tr. 40. 288, 292.[4]) Ms. Sanchez completed the eighth grade in 1970, and most recently worked as an assembly line worker. (Tr. 293, 298.) Ms. Sanchez reported she stopped working on August 19, 2007, due to her medical conditions. (Tr. 292.) Ms. Sanchez's date of last insured is December 31, 2013.[5]

On May 6, 2010, Ms. Sanchez protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.* (Tr. 288, 315-17.) Ms. Sanchez's application was initially denied on November 3, 2010. (Tr. 100, 128-31.) It was denied again at reconsideration on July 19, 2011. (Tr. 101, 139-41.) On August 9, 2011, Ms. Sanchez requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 144-45.) The ALJ conducted a hearing on October 2, 2012. (Tr. 66-99.) On October 22, 2012, ALJ Michelle K. Lindsay issued an unfavorable decision. (Tr. 103-118.) On May 30, 2014, the Appeals Council granted Ms. Sanchez's request for review and remanded the case because

> [t]he Administrative Law Judge considered and relied on evidence that does not pertain to the claimant. Pages 2 through 18 of Exhibit 2F concern an individual other than the claimant. The decision cites to that evidence and appears to make negative inferences based on the evidence (Decision, pages 6, 10, and 12). The Appeals Council has removed that evidence from the claimant's electronic folder. Because the Administrative Law Judge relied on erroneous evidence, further evaluation of the nature and severity of the claimant's condition is required.

---

[3] Ms. Sanchez initially alleged an onset date of August 19, 2007. (Tr. 288.)

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 18) that was lodged with the Court on February 16, 2017.

[5] To receive benefits, a claimant must demonstrate disability prior to her date of last insured. *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

(Tr. 125.)  On remand, the ALJ was instructed to obtain updated treatment records in accordance with the regulations, to further consider the issue of disability in light of correct evidence, and to further evaluate claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms.  (*Id.*)  The ALJ conducted a second hearing on February 9, 2015.  (Tr. 33-65.)  Ms. Sanchez appeared in person and was represented by Attorney Michelle Baca.[6]  The ALJ took testimony from Ms. Sanchez (Tr. 42-59), and from VE Thomas Greiner (Tr. 59-64.)  On June 5, 2015, ALJ Michelle K. Lindsay issued an unfavorable decision.  (Tr. 7-23.)  On September 22, 2016, the Appeals Council issued its decision denying Ms. Sanchez's request for review and upholding the ALJ's final decision.  (Tr. 1-5.)  On October 20, 2016, Ms. Sanchez timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## II.  Applicable Law

### A.  Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

---

[6] Ms. Sanchez is represented in these proceedings by Attorney Francesca J. MacDowell.  (Doc. 1.)

(1)  At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[7]  If the claimant is engaged in substantial gainful activity, she is not disabled regardless of his medical condition.

(2)  At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)  At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)  If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)  If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has

---

[7] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a), 416.972(a).  Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.  *Id.*  Gainful work activity is work activity that you do for pay or profit.  20 C.F.R. §§ 404.1572(b), 416.972(b).

the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

### B. <u>Standard of Review</u>

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not

disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## III. <u>Analysis</u>

The ALJ made her decision that Ms. Sanchez was not disabled at step four of the sequential analysis. (Tr. 22-23.) Specifically, the ALJ determined that Ms. Sanchez met the insured status requirements of the Social Security Act through December 31, 2013, and that Ms. Sanchez had not engaged in substantial gainful activity since August 19, 2007. (Tr. 12.) She found that Ms. Sanchez had severe impairments of degenerative disk disease of the lumbar spine, status-post fusion; borderline intellectual functioning; and obesity. (Tr. 13.) The ALJ, however, determined that Ms. Sanchez's impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 13-16.) As a result, the ALJ proceeded to step four and found that through the date last insured Ms. Sanchez

> had the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b). Specifically, the claimant could lift and/or carry twenty pounds occasionally and ten pounds frequently; push and/or pull twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour workday; and stand, and/or walk for six hour[s] out of the eight-hour workday. Further, she was able to occasionally climb stairs and ramps, balance, stoop, crouch, kneel, and crawl, but never climb ladders, ropes, or scaffolds. From a mental standpoint, she was able to understand, remember, and carry out simple instructions and to maintain attention and concentration to perform simple tasks for two hours at a time without requiring redirection to task. She required work involving no more than occasional change in the routine work setting, and no more than occasional independent goal setting or planning. Work was required to be routine, rote, and repetitive.

(Tr. 16.) The ALJ further concluded at step four that through the date last insured, Ms. Sanchez was capable of performing her past relevant work as a small products assembler, as it is performed at the light exertional level and is unskilled. (Tr. 22.) For this reason, the ALJ

determined that Ms. Sanchez was not under a disability from her alleged onset date through her date last insured.  (Tr. 23.)

In support of her Motion, Ms. Sanchez argues that (1) the ALJ failed to use the correct legal standards in weighing the medical evidence; (2) the ALJ's RFC is not supported by substantial evidence; and (3) the ALJ's past work finding is contrary to evidence and law.  (Doc. 23 at 6-24.)   For the reasons discussed below, the Court finds there is no reversible error.

### A.    Evaluation of Medical Evidence

Ms. Sanchez broadly argues that the ALJ failed to weigh the medical evidence according to law.  (Doc. 23 at 6-16.)  Specifically, she argues that (1) "[t]he ALJ failed to apply the correct legal standard in assessing whether the treating doctor findings supported Ms. Sanchez's claims of inability to walk without limping and losing her balance, that sitting in one position for longer than 15 minutes or standing for more than 10 minutes causes her leg to go to sleep, and that when she moves her head a certain way she becomes dizzy"; (2) the ALJ "play[ed] doctor" by interpreting MRI and treating physician findings; (3) the ALJ improperly weighed State agency examining psychological consultant Louis Wynne, Ph.D's opinion; and (4) the ALJ accorded significant weight to State agency nonexamining psychological consultant Madelyn Miranda-DeCollibus, Psy.D.'s opinion, but failed to incorporate her moderate limitations in the RFC assessment.  (*Id.*)   The Commissioner argues that the ALJ reasonably considered the medical evidence regarding Ms. Sanchez's physical limitations and mental functioning.  (Doc. 25 at 9-17.)  The Court will address each argument in turn.

1. **Treating Physicians**

   a. **Dr. S. Kassicieh**

Prior to her date of last insured, the medical evidence record indicates that Ms. Sanchez saw Dr. S. Kassicieh, DO ten times from July 15, 2009, through May 13, 2010.[8] (Tr. 413-414, 445-446, 449.) Ms. Sanchez's chief complaint at five of these visits was "Rx refills."[9] (Tr. 414, 446, 449.) On one visit, on May 13, 2010, Ms. Sanchez's chief complaint was "back pain." (Tr. 445.) Dr. Kassicieh noted physical exam results at five of the ten visits, which were all within normal limits.[10] (Tr. 413, 445, 449.) Dr. Kassicieh assessed hypertension at four visits, and arthralgia at five visits. (Tr. 413-414, 445, 449.)

   b. **Dr. Donald Ortiz**

Ms. Sanchez presented to Dr. Donald Ortiz of Midtown Family Medicine on February 25, 2010, to establish care. (Tr. 479-80.) Ms. Sanchez reported a past medical history of hypertension, carpal tunnel syndrome, fibromyalgia, and disability since 2007. (Tr. 479.) She reported using hydrocodone daily for chronic pain and fibromyalgia. (*Id.*) Ms. Sanchez told Dr. Ortiz that her present concern was for neck pain after falling three months earlier. (*Id.*) She stated she had a herniated disk in her neck and had a cervical MRI in 2009, but no records were available. (*Id.*) On his review of systems, Dr. Ortiz noted that Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (*Id.*) On physical exam, Dr. Ortiz noted, *inter alia*, that Ms. Sanchez's neck was supple without significant lymphadenopathy or thyromegaly. (*Id.*) Dr. Ortiz also noted that Ms. Sanchez's extremities showed no cyanosis, clubbing or edema, and that her reflexes and gait were normal. (Tr. 480.) Dr. Ortiz assessed

---

[8] Dr. Kassicieh's records are illegible for the most part.

[9] Because Dr. Kassicieh's records are illegible, it is not clear what, if any, medications he prescribed.

[10] There are no physical exam findings for the other five visits.

hypertension and "myalgia and myositis unspecified," and increased her hydrocodone to twice daily. (*Id.*)

On March 11, 2010, Ms. Sanchez saw Dr. Ortiz for follow up and reported that the increased hydrocodone was not helping. (Tr. 478.) She said that she had been helped more in the past with oxycodone. (*Id.*) Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (*Id.*) On physical exam, Dr. Ortiz noted, *inter alia*, that Ms. Sanchez's neck was supple without significant lymphadenoapathy or thyromegaly. (*Id.*) Dr. Ortiz also noted that her extremities showed no cyanosis, clubbing or edema, and that her reflexes and gait were normal. (*Id.*) Dr. Ortiz prescribed Ms. Sanchez with oxycodone, twice daily, to control her reported pain. (Tr. 479.)

On April 8, 2010, Ms. Sanchez saw Dr. Ortiz and reported no concerns, except that her pain was not controlled with the twice daily dosing of oxycodone. (Tr. 477.) Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (*Id.*) Dr. Ortiz's physical exam remained the same. (*Id.*) Dr. Ortiz increased oxycodone to three times daily, and added Tramadol three times daily. (Tr. 478.)

On October 29, 2010, Ms. Sanchez presented to Dr. Ortiz for prescription refills. (Tr. 475-76.) She reported having breakthrough pain and requested oxycodone four times daily. (Tr. 476.) Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (*Id.*) Dr. Ortiz's physical exam was unchanged. (*Id.*) Dr. Ortiz increased oxycodone to four times daily and added Cyclobenzaprine one time daily. (*Id.*)

On May 13, 2011, Ms. Sanchez presented to Dr. Ortiz and reported her pain was worse and she needed oxycodone five times daily. (Tr. 474.) Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (*Id.*) On physical exam, Dr. Ortiz noted, *inter*

*alia*, that Ms. Sanchez's neck was supple, her gait was normal, and that she had no strength, sensory or motor deficits in her upper or lower extremities. (*Id.*) Dr. Ortiz increased oxycodone to five times daily. (*Id.*)

On October 28, 2011, Ms. Sanchez saw Dr. Ortiz and reported that her pain was increasing, that it was harder to ambulate, and that at times the pain radiated into her right leg. (Tr. 512-13.) Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (Tr. 512.) On physical exam, Dr. Ortiz noted, *inter alia*, that Ms. Sanchez's neck was supple, her gait was normal, and that she had no strength, sensory or motor deficits in her upper or lower extremities. (*Id.*) Dr. Ortiz continued oxycodone five times daily and increased Tramadol to two tablets, three times daily. (Tr. 513.)

On December 15, 2011, Ms. Sanchez presented to Dr. Ortiz for follow up on chronic pain. (Tr. 510-11.) Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (Tr. 510.) Dr. Ortiz's physical exam demonstrates, inter alia, that Ms. Sanchez's neck was supple, her gait was normal, and that she had no strength, sensory or motor deficits in her upper or lower extremities. (*Id.*) Dr. Ortiz instructed Ms. Sanchez to continue on her current medications. (Tr. 511.)

On March 6, 2012, Ms. Sanchez saw Dr. Ortiz for follow up on chronic pain. (Tr. 534-35.) Ms. Sanchez denied, *inter alia*, any dizziness or focal weakness or loss of sensation. (Tr. 534.) On physical exam, Dr. Ortiz noted that Ms. Sanchez's neck was supple, her gait was normal, and that she had no strength, sensory or motor deficits in her upper or lower extremities. (*Id.*) Dr. Ortiz also noted that Ms. Sanchez's drug screen was positive for opiates, negative for prescribed oxycodone, and positive for cocaine. (*Id.*) Ms. Sanchez admitted using cocaine over

the weekend.  (Tr. 535.)  Dr. Ortiz informed Ms. Sanchez that he would no longer be able to prescribe her controlled medications.  (*Id.*)

###     c.     <u>Craig S. Nairn, M.D.</u>

On December 16, 2011, Ms. Sanchez presented to Craig S. Nairn, M.D., and complained of lower back pain.  (Tr. 518-19.)  She described pain in both her lower back and neck, and reported a history of fibromyalgia.  (Tr. 518.)  Ms. Sanchez told Dr. Nairn that she had a lumbar fusion years ago which did not help and that her only treatment had been medications.  (Tr. 518.)  Ms. Sanchez told Dr. Nairn that she had not had any treatment for her neck.  (*Id.*)  Ms. Sanchez also told Dr. Nairn that she was on disability because of her pain.  (*Id.*)  On Dr. Nairn's review of systems, Ms. Sanchez affirmed, *inter alia*, insomnia, dizziness, memory loss "sometimes," depression and anxiety, joint pain and weakness, and muscle weakness.  (Tr. 518-19.)  On physical exam, Dr. Nairn noted that Ms. Sanchez's neck had limited range of motion and side bending, and right-sided tenderness on palpation.  (Tr. 518.)  He also noted that Ms. Sanchez indicated midline vertebral tenderness on palpation, but that her lower back exam was otherwise normal.  (Tr. 519.)  Dr. Nairn assessed post-laminectomy syndrome, axial neck pain, and fibromyalgia.  (*Id.*)  He ordered an MRI scan to investigate the source of Ms. Sanchez's neck and lower back pain, and instructed her to continue on her medication management for fibromyalgia. (*Id.*)  Dr. Nairn indicated he could consider a rheumatology referral in the future to confirm the fibromyalgia diagnosis and optimize treatment.  (*Id.*)

On January 27, 2012, Ms. Sanchez returned to Dr. Nairn for follow up and to discuss the MRI results.  (Tr. 515-16.)  Ms. Sanchez reported continued pain in her lower back with radiation to her hips and legs, somewhat worse on the right side, and pain in her midback and neck.  (Tr. 515.)  She denied any new or progressive numbness or weakness.  (*Id.*)  On physical

exam, Dr. Nairn noted that Ms. Sanchez's neck had limited range of motion and side bending, and right-sided tenderness on palpation. (*Id.*) He also noted that Ms. Sanchez indicated midline vertebral tenderness on palpation, but that her lower back exam was otherwise normal. (*Id.*) Dr. Nairn discussed with Ms. Sanchez that her MRI results were essentially normal, and that he thought her neck and upper back pain were probably associated with fibromyalgia or soft tissue injury. (*Id.*) However, because the MRI demonstrated stenosis at L4-5 and associated degenerative changes at L5-S1, Dr. Nairn recommended a lumbar epidural. (Tr. 516.)

### d.     The ALJ Properly Evaluated the Treating Physicians' Treatment Notes

The Social Security Act provides that, in considering whether a person is disabled under Title II, "[o]bjective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques ... *must* be considered in reaching a conclusion as to whether the individual is under a disability." 42 U.S.C. § 423(d)(5)(A) (Supp. IV 1986) (emphasis added). Thus, the Act makes clear that the Secretary must consider all relevant medical evidence of record in reaching a conclusion as to disability. *See Ray v. Bowen*, 865 F.2d 222, 226 (10th Cir. 1989) ("[t]he ALJ must determine the claimant's eligibility for disability benefits in light of the entire record"); *Herbert v. Heckler*, 783 F.2d 128, 130 (8th Cir. 1986) (it is insufficient that there are inconsistencies in objective medical evidence to support the Secretary's denial of benefits, "[t]he Secretary must demonstrate that she *evaluated all* the evidence").

The ALJ properly evaluated the treatment notes of Ms. Sanchez's treating physicians during the relevant period of time.[11] As an initial matter, none of Ms. Sanchez's treating physicians provided *medical opinions*.

---

[11] The ALJ discussed treatment notes from Carlos J. Esparza, M.D.; however, she properly noted that his treatment notes were dated well after Ms. Sanchez's date of last insured. (Tr. 19-20.) *See Baca v. Dep't of Health and Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993) (explaining that while medical evidence after the date of last insured status

> Medical opinions are statements from an acceptable medical source that reflect judgments about the nature and severity of [a claimant's] impairments, including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions.

20 C.F.R. 404.1527(a)(1).[12]   As such, Ms. Sanchez's argument that the ALJ was required to evaluate and weigh Ms. Sanchez's treating physicians' treatment notes by applying the specific factors when evaluating medical opinion evidence (Doc. 23 at 6) is misplaced.  *Id.*  Moreover, the ALJ discussed and evaluated Dr. Ortiz's and Dr. Nairn's treatment notes in her step four analysis, as she was required to do.[13]  (Tr. 17-19.)  In doing so, the ALJ accurately noted that Dr. Ortiz's physical examinations were essentially normal, and that although Dr. Nairn's physical exams revealed some tenderness on palpation and limited range of motion in Ms. Sanchez's neck, they were otherwise normal as well.  (Tr. 17-18.)  The Court's review of the medical evidence record demonstrates the ALJ's findings are supported by substantial evidence. Dr. Ortiz noted in all eight of his treatment notes that Ms. Sanchez denied any dizziness or focal motor weakness or loss of sensation.  (Tr. 474, 475-76, 477-78, 478, 479-80, 510-11, 512-13, 534-35.)  Dr. Ortiz further noted at every visit that Ms. Sanchez's gait was normal.  (*Id.*) Dr. Ortiz also specifically noted in four of his eight treatment notes that Ms. Sanchez had no

---

may be relevant, the key is that the subsequent evidence bears upon the severity of the claimant's impairments during the period between the onset date and the last insured status date); *see also Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991) (finding that proffered evidence must relate to the time period of which the benefits are denied).

[12] For all claims filed on or *after* March 27, 2017, 20 C.F.R. § 404.1527 was rescinded and replaced with 20 C.F.R. § 404.1520c.  82 Fed. Reg. 5844, 5869.  Further, the Social Security Administration rescinded SSR 96-2p effective March 27, 2017, to the extent it is inconsistent with or duplicative of final rules promulgated related to Giving Controlling Weight to Treating Source Medical Opinions found in 20 C.F.R. § 404.1527.  82 Fed. Reg. 5844, 5845.

[13] The ALJ did not discuss Dr. Kassicieh's treatment notes.  However, the Court is persuaded this is harmless because Dr. Kassicieh's did not provide a medical opinion and his treatment notes (to the extent they are legible) do not support greater limitations than those assessed by the ALJ.  *See generally Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (the need for express analysis is weakened "[w]hen the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC.") (quoting *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012)).

strength, sensory or motor deficits in her upper or lower extremities. (Tr. 474, 510-11, 512-13, 534-35.) Similarly, Dr. Nairn's two exams were essentially normal, but for some tenderness on palpation and limited range of motion in Ms. Sanchez's neck.[14] (Tr. 508-09, 515-16.) Ms. Sanchez's argument that her treating physicians' treatment notes support her alleged claims that she could not walk without limping and losing her balance, or that her leg goes to sleep when sitting or standing in one position for too long, or that she becomes dizzy when she moves her head a certain way is without merit. The ALJ properly evaluated Ms. Sanchez's treating physicians' treatment notes and her findings are supported by substantial evidence.

### 2. ALJ Findings

Ms. Sanchez next argues that the ALJ's evaluation of the medical evidence is not supported by substantial evidence because (1) the ALJ "play[ed] doctor" when she characterized Ms. Sanchez's MRI findings as showing "minor" bilateral neuroforaminal encroachment; (2) Dr. Nairn's treatment notes supported Ms. Sanchez's claim of manipulative limitations;[15] (3) the ALJ improperly relied on Dr. Ortiz's normal motor and gait findings contrary to SSR 12-2p;[16] (4) the ALJ failed to discuss Dr. Ortiz's myalgia diagnosis and medication treatment for pain; and (5) the ALJ improperly characterized Ms. Sanchez's October 2014 MRI findings as "mild." (Doc. 23 at 10-11.)

Ms. Sanchez's argument essentially asks the Court to reweigh the evidence, which the Court will not do, and is, in any event, without merit. *See Oldham v. Astrue*, 509 F.3d 1254,

---

[14] Ms. Sanchez states that Dr. Nairn diagnosed fibromyalgia; however, this is misleading. (Doc. 23 at 8.) Dr. Nairn included a diagnosis of fibromyalgia in his assessment based solely on Ms. Sanchez's reported history. He specifically noted that he might consider a rheumatology referral in the future to confirm the diagnosis. (Tr. 515-16.)

[15] Ms. Sanchez does not identify what manipulative limitations she alleges Dr. Nairn's findings support.

[16] SSR 12-2p, 2012 WL 3104869 (Evaluation of Fibromyalgia).

1257-58 (10th Cir. 2007 ("We review only the sufficiency of the evidence, not its weight . . . Although the evidence may also have supported contrary findings, we may not displace the agency's choice between two fairly conflicting views . . . ."). First, the MRI findings Ms. Sanchez refers to specifically state "[t]here is *minor* L4 neuroforaminal encroachment bilaterally."[17] (Tr. 522.) (Emphasis added.) As such, the ALJ did not play doctor, substitute her lay opinion, or make an improper speculative inference because she repeated the radiologist's findings verbatim. (Compare Tr. 19 and Tr. 522.) Second, although Dr. Nairn's physical exams demonstrated limited range of motion in Ms. Sanchez's neck, Dr. Nairn's treatment notes do not assess any manipulative functional limitations[18] as a result.[19] (Doc. 508-09, 515-16.) Third, the ALJ's reliance on Dr. Ortiz's normal exams to find that Ms. Sanchez was not impaired to the degree she alleged was proper and not contrary to SSR 12-2p because the ALJ's finding that the medical evidence record does not support Ms. Sanchez's self-reported fibromyalgia diagnosis is supported by substantial evidence. (Tr. 13.) Fourth, the ALJ did discuss that despite Dr. Ortiz's normal exams, he nonetheless prescribed oxycodone to deal with her pain. (Tr. 17.) Fifth, the ALJ properly characterized the October 2014 MRI findings,[20] and properly noted that the study

---

[17] Dr. Nairn discussed the MRI lumbar spine findings with Ms. Sanchez and said they showed "stenosis at L4-5 associated degenerative changes and postoperative changes as well as some granulation tissue at L5-S1." (Tr. 515-16.) He recommended an epidural. (Tr. 516.)

[18] Manipulative Limitations include reaching all directions (including overhead); handling (gross manipulation); fingering (fine manipulation); and feeling (skin receptors). (Tr. 468.)

[19] Dr. Nairn discussed the MRI cervical spine findings with Ms. Sanchez and characterized them as "essentially normal." (Tr. 515.)

[20] The report states at S1-2: postsurgical change with extensor muscle atrophy, no stenosis; at L5-S1: postsurgical change with extensor muscle atrophy greater on the right, *mild* bilateral neural foraminal stenosis and exiting nerve abutment, no disc herniation; L4-5: grade 1 anterolisthesis with *mild* loss of disc height, moderate facet and ligamentous hypertrophy and *mild* facet capsulitis, moderate bilateral neural foraminal, central canal and lateral recess stenosis with moderate existing and descending nerve impingement; L3-4: *mild* retrolisthesis, *mild* leftward disc protrusion, *mild* facet hypertrophy and bilateral facet capsulitis; *mild* left neural foraminal stenosis and exiting nerve abutment; L2-3: *mild* loss of disc height, retrolisthesis and disc protrusion with *mild* facet hypertrophy but no stenosis or impingement; L1-2: *mild* loss of disc height and minimal disc protrusion with *mild* facet arthrosis but no stenosis; *mild* SI joint arthrosis. (Tr. 576.) (Emphasis added.)

was performed well after the date last insured expired.[21]  (Tr. 20, 576.)  The ALJ's findings regarding the medical evidence are supported by substantial evidence.

### 3.    Louis Wynne, Ph.D.

On June 22, 2011, Ms. Sanchez presented to Louis Wynne, Ph.D., for a mental status exam.  (Doc. 485-87.)   Dr. Wynne noted that Ms. Sanchez's affect was open and congruent, with a dysphoric mood.  (Tr. 485.)  He further noted that she maintained good eye contact and related easily, but that her cooperation was limited by her low level of intellectual functioning.  (*Id.*)   Ms. Sanchez reported medical conditions of arthritis, fibromyalgia, and breathing difficulties NOS.  (Tr. 486.)  She also reported using a cane and wearing braces on both her wrists as needed.  (*Id.*)

On questioning, Ms. Sanchez denied any contact with mental health professionals, psychotic episodes, unwanted behaviors, inpatient psychiatric admissions, overdoses, or any episodes of self-injury.  (Doc. 486.)  She denied the use of tobacco, alcohol, and any other substance abuse.  (*Id.*)  She reported she last worked as a maid and janitor and that it was "a long time ago."  (*Id.*)  Ms. Sanchez stated she was unable to remember where she was born, any of her childhood achievements or developmental milestones,[22] or her parents' circumstances at the time she was born; *i.e.,* where her father worked and whether she and her mother went home from the hospital together.  (Tr. 486.)  She could not remember her height or weight.  (Tr. 485.)  She also could not remember the name of her oldest daughter's father.  (Tr. 487.)  She reported that her parents and four of her seven siblings were deceased, but could not provide any details.  (*Id.*)  Dr. Wynne   concluded   that   Ms. Sanchez's   ability   to   present   a   plausible,   detailed,   and

---

[21] *See* fn. 4, *supra.*

[22] Ms. Sanchez reported she completed the eighth grade in special education.  (Tr. 486.)

comprehensive personal history was impaired, and that the information she provided should be verified before any reliance was placed on it. (Tr. 486.)

On exam, Dr. Wynne noted that Ms. Sanchez could not copy a pair of intersecting pentagons or remember and carry out a written three-part set of directions. (Tr. 485-86.) She could not count backwards from 100 either by threes or by sevens, and she could not remember a set of digits forwards even to three. (Tr. 486.) She could not remember a set of digits backwards even to two. (*Id.*) She could not spell a common five-letter word forwards and her short-term memory for both items and words was severely impaired. (*Id.*) Dr. Wynne noted that Ms. Sanchez's performance of operations in simple mental arithmetic was also impaired. (*Id.*) Dr. Wynne further noted that her judgment, based on her answers to Wechsler Adult Intelligence Scale-type comprehension questions, was impaired. (*Id.*)

Dr. Wynne's Summary and Clinical Impressions were as follows:

The following impressions are based on my estimation of the claimant's psychological condition and not on any medical limitations that might be present. Joann Sanchez is a 54-year-old woman who looked her age. Her cooperation with this examination was limited by her low level of intellectual functioning but there is no reason to suspect malingering or dissimulation.

She cannot remember and carry out basic written instructions and her concentration and ability to persist at simple work tasks are severely impaired. She could not interact well with the general public, her coworkers, or her supervisors. She also would have difficulty adapting to changes in the workplace. She might not be able to recognize even obvious hazards and she could not manage her own benefit payments.

(Tr. 487.) Dr. Wynne's Axis II[23] diagnoses were borderline intellectual functioning and r/o mild mental retardation. (Tr. 487.) He assessed a GAF score of 40.[24] (*Id.*)

---

[23] Axis II is the assessment of personality disorders and intellectual disabilities. http://www.psyweb.com/DSM_IV/jsp/dsm_iv.jsp These disorders are usually life-long problems that first arise in childhood. *Id.*

The ALJ accorded Dr. Wynne's opinion little weight for several reasons. (Tr. 21.) First, the ALJ explained that Dr. Wynne's functional assessment was not supported by the record as a whole. (*Id.*) Second, she explained that Dr. Wynne based his functional assessment on a one-time evaluation, which is only a snapshot of the claimant's overall functional capacity. (*Id.*) Third, she explained that Dr. Wynne based his functional assessment on claimant's self-reports and subjective allegations, which the ALJ determined were not credible. (*Id.*) Fourth, the ALJ explained that Ms. Sanchez did not claim any mental condition as a basis for her disability. (*Id.*) Ms. Sanchez argues that the ALJ's explanations are either not supported by substantial evidence or are improper. (Doc. 23 at 12-15.) The Court disagrees.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). Specifically, when assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why. SSR 96-5p, 1996 WL 374183 at *5.[25] "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215 (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir.

---

[24] A GAF score is a subjective rating on a one hundred point scale, divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000). A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.* at 34.

[25] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 404.1520b and 404.1527 and applicable to claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, 5845, 5867, 5869.

1995)).[26]  An ALJ need not articulate every factor.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions."  SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).  The ALJ's decision for according weight to medical opinions must be supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005).

The ALJ provided appropriate explanations for the weight she accorded Dr. Wynne's functional assessment that are supported by substantial evidence, and correctly determined that the record does not support the degree of limitation Dr. Wynne assessed.  (Tr. 21.)

> a.  **The ALJ Properly Found That Dr. Wynne's Functional Assessment Was Inconsistent With the Record As a Whole**

Here, the record supports that Ms. Sanchez reported and testified she completed the eighth grade.[27]  (Tr. 42, 72, 293.)  As the ALJ noted, however, there is conflicting evidence whether Ms. Sanchez attended special education classes.[28]  (Tr. 15.)  Ms. Sanchez testified that

---

[26] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. § 404.1527(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

[27] The Social Security Administration generally considers that a 7th through the 11th grade level of formal education is a limited education.  20 C.F.R. § 404.1564(b)(3).  "Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs."  *Id.*

[28] When asked on her application whether she attended special education classes, Ms. Sanchez reported "no."  (Tr. 293.)  Ms. Sanchez, however, testified at her first administrative hearing that she attended special education classes, and reported to Dr. Wynne that she attended special education classes.  (Tr. 72, 486.)

she is only able to read short lists, magazines and children's books, and that she can only write a "little bit."[29]  (Tr. 42-43, 72-73.)  That said, the ALJ properly explained that the record does not support the level of cognitive impairment Dr. Wynne assessed.  For example, the ALJ discussed that Ms. Sanchez was initially laid off from her products assembler job due a change in management, but was then called back and returned to work, demonstrating her ability to meet the demands of the job.[30]  (Tr. 22.)  The ALJ discussed that when Ms. Sanchez stopped working as a products assembler the second time, she testified it was due to her alleged physical impairments.  (Tr. 22.)  The ALJ discussed that Dr. Wynne himself observed Ms. Sanchez had good eye contact, related easily, and was cooperative and pleasant.  (Tr. 14.)  The ALJ discussed that Ms. Sanchez reported that she had no difficulty getting along with others, including authority figures, and that she had never been fired from a job due to an inability to get along with others.  (*Id.*)    The ALJ discussed that Ms. Sanchez testified that when she previously received Social Security benefits, they were mailed directly to her and that she deposited them into her own bank account.  (Tr. 15.)  The ALJ discussed that Ms. Sanchez testified she had no difficulty dealing with the bank.  (*Id.*)  The ALJ also discussed that Ms. Sanchez was able to negotiate the settlement of an overpayment with the Social Security Administration related to her earlier disability claim.  (Tr. 21.)  The record supports these findings.  (Tr. 46, 57, 76-77, 92, 94, 349-50, 485.)

The Court's review of the records further demonstrates that at the administrative hearings in this matter, Ms. Sanchez knew the date she was born, testified about her height and weight, accurately remembered her most recent employment and the year she stopped working, knew her

---

[29] Ms. Sanchez testified at the October 2, 2012, Administrative Hearing that she could only write her name.  (Tr. 72-72.)

[30] Ms. Sanchez worked as a small products assembler from December 1999 until August 2007.  (Tr. 298.)

address, described her job as a products assembler, described her medical impairments and alleged problems with functioning, and knew the names of her medications. (Tr. 42-59, 72-94.) She also reported to State agency examining medical consultant Dr. Karl Moedl that her father died of hypertension and obesity, and her mother died of rectal cancer. (Tr. 457.) Although Ms. Sanchez argues that Dr. Wynne's functional assessment is consistent with the record because *several doctors* treating Ms. Sanchez for back pain mentioned her depression and anxiety, Ms. Sanchez cites only one record during the relevant period of time wherein Dr. Nairn noted that Ms. Sanchez self-reported depression and anxiety. (Doc. 23 at 14.) That aside, Ms. Sanchez's argument overlooks that Dr. Wynne did not diagnose either depression or anxiety, but instead based his functional assessment on Ms. Sanchez's borderline intellectual functioning. (Tr. 487.)

For the foregoing reasons, the ALJ's explanation that Dr. Wynne's functional assessment was not consistent with the record as a whole is supported by substantial evidence and is a legitimate reason for discounting his opinion. *See* 20 C.F.R. § 1527(c)(4) (explaining that the more consistent a medical opinion is with the record as a whole, the more weight will be given to that medical opinion).

### b. __The ALJ Properly Explained Dr. Wynne's Examining Relationship With Ms. Sanchez__

The ALJ explained that she accorded less weight to Dr. Wynne's functional assessment because it was a "one-time evaluation, which is only a snapshot of the claimant's overall functional capability." (Tr. 21.) In *Chapo v. Astrue*, 682 F.3d 1285 (10th Cir. 2012), the ALJ rejected a consultative examiner's opinion solely on the basis of the limited treatment relationship. 682 F.3d at 1291. The Tenth Circuit held that this explanation *by itself* was not a proper basis for rejecting a consultative exam because "otherwise the opinions of consultative

examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Id.* In contrast, the ALJ here provided this reason as one of several reasons for according little weight to Dr. Wynne's functional assessment. In the context of his complete analysis, the ALJ's explanation that Dr. Wynne's treatment relationship was limited to one consultative exam is a legitimate reason for according less weight to his opinion. *See* 20 C.F.R. § 1527(c)(2) (explaining that the more times you have been seen by a treating source, the more weight will be given to that medical opinion); *see generally Thomas v. Berryhill*, 685 F. 659, 662-63 (10th Cir. 2017) (unpublished)[31] (finding the ALJ properly accorded less weight to medical opinion where consultative examiner did not review the entire medical record); *see also* 20 C.F.R. 404.1527(c)(6) (explaining that the extent to which a medical source is familiar with the other information in your case record is a relevant factor in deciding the weight to give a medical opinion.)

### c. The ALJ Properly Discounted Dr. Wynne's Functional Assessment to the Extent He Relied On What Ms. Sanchez Told Him and the ALJ Found Not Credible

Ms. Sanchez argues that the ALJ ignored Dr. Wynne's "clinical findings" and GAF score when she determined that his findings were based on Ms. Sanchez's subjective allegations, which she found not credible. (Doc. 23 at 14.) However, the ALJ did discuss Dr. Wynne's findings from the mental status exam and the GAF score (Tr. 20-22), and determined that Dr. Wynne's functional assessment was inconsistent with the record as a whole. *See* Section III.A.2.a., *supra*. Thus, contrary to Ms. Sanchez's argument, the ALJ did not ignore

---

[31] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

Dr. Wynne's findings. Having found Ms. Sanchez not credible,[32] however, the ALJ could discount Dr. Wynne's findings to the extent that they were based on what Ms. Sanchez told him that was not consistent with the record as a whole. *Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir. 2016) (unpublished); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005) (finding the ALJ was free to reject a treating psychologist's opinion where it appeared to be based on subjective complaints and isolated instances "rather than objective findings"). This is a legitimate explanation for according Dr. Wynne's opinion less weight. *Id.*

### d.    The ALJ Properly Considered Ms. Sanchez's Mental Impairment Even Though She Did Not Allege It As A Basis for Her Disability Claim

Ms. Sanchez argues that the ALJ erred in relying on the fact that she did not base her disability claim on any mental impairments as a basis for rejecting mental impairment evidence and finding her not disabled. (Doc. 23 at 14.) This argument misunderstands the ALJ's reasoning. In fact, the ALJ explained that Ms. Sanchez did not allege a mental impairment either initially or at reconsideration, and denied any mental condition, including emotional or learning problems,[33] but that the Social Security Administration had referred Ms. Sanchez for a psychological consultative exam based on evidence in the original record that did not pertain to her.[34] (Tr. 20, 125.) The record supports these findings. (Tr. 292, 295, 332.) Nonetheless, the ALJ properly considered Dr. Wynne's findings at step two and step four of her analysis as she was required to do (Tr. 13-15, 16-22). *See Wells v. Colvin*, 727 F.3d 1061, 1068 (10th Cir. 2013) (describing the ALJ's responsibility to evaluate mental impairments at step two and step four of

---

[32] Ms. Sanchez has raised no objection to the ALJ's findings regarding the inconsistency of Ms. Sanchez's statement to Dr. Wynne with the record as a whole.

[33] Ms. Sanchez reported that she had not sought medical treatment for any mental condition (including emotional or learning problems). (Tr. 295.)

[34] The records at issue documented an emergency room visit for an anxiety attack. (Tr. 20.) The records were subsequently removed from Ms. Sanchez's folder. (*Id.*)

the sequential evaluation process). The ALJ appropriately addressed Ms. Sanchez's mental impairment even though Ms. Sanchez did not allege it as a basis for her disability claim. There is no error as to this issue.

For all of the foregoing reasons, the Court finds that the ALJ properly evaluated Dr. Wynne's opinion and provided legitimate reasons for according it little weight that are supported by substantial evidence.

### 4. State Agency Nonexamining Psychological Consultant Madelyn Miranda-DeCollibus, Psy.D.

On July 7, 2011, State agency nonexamining psychological consultant Madelyn Miranda-DeCollibus, Psy.D., reviewed Ms. Sanchez's medical records and prepared a Psychiatric Review Technique[35] and a Mental Residual Functional Capacity Assessment ("MRFCA"). (Tr. 488-501, 502-04.) In Section I of the MRFCA, Dr. Miranda-DeCollibus assessed that Ms. Sanchez was *not significantly limited* in her ability (1) to remember locations and work-like procedures; (2) to understand and remember very short and simple instructions; (3) to carry out very short and simple instructions; (4) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) to sustain an ordinary routine without special supervision; (6) to work in coordination with or proximity to others without being distracted by them; (7) to make simple work-related decisions; (8) to interact appropriately with the general public; (9) to ask simple questions or request assistance; (10) to accept instructions and respond

---

[35] "The psychiatric review technique described in 20 CFR 440.1520a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4. Dr. Miranda-DeCollibus rated Ms. Sanchez as having moderate functional limitations in her activities of daily living, mild functional limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 498.)

appropriately to criticism from supervisors; (11) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (12) to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (13) to be aware of normal hazards and take appropriate precautions. (Tr. 502-03.) Dr. Miranda-DeCollibus also assessed that Ms. Sanchez was *moderately limited* in her ability to (1) understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to maintain attention and concentration for extended periods; (4) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) to respond appropriately to changes in the work setting; (6) to travel in unfamiliar places or use public transportation; and (7) to set realistic goals or make plans independent of others. (*Id.*) In Section III of the MRFCA, Dr. Miranda-DeCollibus concluded that

> [t]he claimant's ability to understand an[d] remember complex or detailed instructions is limited, however, she can be expected to understand, remember and carry out simple instructions which are presented orally. Basic memory processes reveal moderate limitations. She can perform work in a stable environment. Moreover, she is capable of working within a work schedule and at a consistent pace from a psych perspective. She would be able to maintain regular attendance and be punctual. Also, the claimant would not require special supervision in order to sustain a simple and repetitive work routine.

> Due to the presence of anxiety and low intellectual functioning, [claimant] may be moderately limited in responding appropriately to changes in the work setting and traveling in unfamiliar places. She would require assistance to set realistic goals and make plans independently of others. [Claimant] is better suited for work in stable, routine environment.

> The claimant is able to meet the basic demands in simple repetitive work on a sustained basis despite the limitations resulting from any impairment.

(Tr. 504.) The ALJ, in turn, assessed that from a mental standpoint Ms. Sanchez

> was able to understand, remember, and carry out simple instructions and to maintain attention and concentration to perform simple tasks for two hours at a

time without requiring redirection to task. She required work involving no more than occasional change in the routine work setting, and no more than occasional independent goal setting or planning. Work was required to be routine, rote, and repetitive.

(Tr. 16.)

Ms. Sanchez argues that the ALJ accorded significant weight to Dr. Miranda-DeCollibus's opinion, but failed to account for *all* of her Section I moderate limitations in the RFC assessment, thereby engaging in inappropriate picking and choosing from her opinion. (Doc. 23 at 15-16.)

Tenth Circuit case law requires ALJs to consider the entire MRFCA. *See Nelson v. Colvin,* 655 F. App'x 626, 629 (10th Cir. 2016) (unpublished) (finding no reversible error regarding the ALJ's mental RFC assessment because the ALJ effectively accounted for *all* the limitations indicated in Section I of the MRFCA) (emphasis in original); *Lee v. Colvin*, 631 F. App'x 538, 541-42 (10th Cir. 2015) (finding no reversible error regarding the ALJ's RFC assessment because the ALJ did not ignore the Section I limitations and the RFC assessment reflected the moderate limitations identified in Section I of the MRFCA); *Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished) (explaining that an ALJ cannot turn a blind eye to moderate Section I limitations, and that if a consultant's Section III narrative fails to describe the effect of Section I limitations on a claimant's ability, or contradicts certain Section I limitations, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ"s RFC finding); *see also Smith v. Colvin*, 821 F.3d 1264, 1268-69 (10th Cir. 2016) (finding that an ALJ need not incorporate verbatim the moderate nonexertional limitations

found in Section I if the ALJ incorporates the functional aspects of a claimant's nonexertional limitations assessed in Section III).[36]

The ALJ's RFC assessment sufficiently incorporated the functional aspects of Ms. Sanchez's nonexertional limitations assessed in Dr. Miranda-DeCollibus's Section III narrative. Here, Dr. Miranda-DeCollibus applied her Section I findings and concluded in Section III that Ms. Sanchez was functionally capable of meeting the basic mental demands of simple repetitive work on a sustained basis despite the limitations resulting from any impairment.[37] The MRFCA is therefore considered part of the substantial evidence supporting the ALJ's RFC assessment. *Carver*, 600 F. App'x at 619. In turn, although the ALJ's RFC assessment did not repeat verbatim Dr. Miranda-DeCollibus's Section III narrative, the ALJ's

---

[36] In *Smith v. Colvin*, the plaintiff argued that the ALJ erred in omitting moderate nonexertional impairments in assessing her RFC. Specifically, one evaluation found the plaintiff to be moderately limited in her ability to

- maintain concentration, persistence and pace,
- remain attentive and keep concentration for extended periods,
- work with other without getting distracted,
- complete a normal workday and workweek without interruption from psychologically based symptoms,
- perform at a consistent pace without excessive rest periods,
- accept instructions and respond appropriately to criticism by supervisors,
- get along with coworkers or peers without distracting them or engaging in behavioral extremes,
- respond appropriately to changes in the workplace, and
- set realistic goals or independently plan.

*Id.* at 1268. Applying these assessments from Section I of the MRFCA, the nonexamining State agency medical consultant found in Section III that the plaintiff could "(1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ in *Smith* "arrived at a similar assessment," concluding that the plaintiff "could not engage in face to face contact with the public and could engage in only simple, repetitive and routine tasks." *Id.* at 1269. The Tenth Circuit found that, while the ALJ "did not repeat the moderate limitations assessed by the doctors" he sufficiently "incorporated these limitations by stating how the claimant was limited in the ability to perform work-related activities." *Id.* The Tenth Circuit also clarified that it is the narrative portion of the MRFCA form that controls the ALJ's assessment. *Id.* at n. 2.

[37] "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374174, at *6. *See also* SSR 96-9p, 1996 WL 374185, at *9 (explaining that unskilled work generally requires the ability to understand, remember and carry out simple instructions, make judgments that are commensurate with the functions of unskilled work – *i.e.,* simple work-related decisions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting); *see also* POMS DI 25020.010.B.3 (noting that the capacity to perform unskilled work includes ability to maintain attention for extended periods of two-hour segments but that concentration is "not critical").

RFC assessment nonetheless captured the essence of the consultants' Section III assessments. *Id.* at 620. Thus, Ms. Sanchez's argument that the ALJ engaged in inappropriate picking and choosing from Dr. Miranda-DeCollibus's opinion necessarily fails. Additionally, Ms. Sanchez's argument that the ALJ should have accounted for *every* moderate limitation Dr. Miranda-DeCollibus's assessed in Section I also fails because her Section III narratives adequately captured the limitations found in Section I, and the ALJ's mental RFC adequately incorporated the functional aspects of Ms. Sanchez's nonexertional limitations assessed in the Section III narratives. *Smith*, 821 F.3d at 1269. The ALJ properly applied the correct legal standards in evaluating the medical evidence and her findings are supported by substantial evidence. As such, there is no reversible error as to this issue.

**B.        RFC Assessment**

Ms. Sanchez argues that the ALJ's RFC assessment failed to include certain limitations that are supported by the medical evidence. (Doc. 23 at 16-21.) First, Ms. Sanchez argues that the ALJ found Ms. Sanchez's carpal tunnel syndrome and fibromyalgia to be nonsevere, but failed to consider the effects of those impairments in her RFC assessment. (*Id.* at 17.) Second, Ms. Sanchez argues that the ALJ failed to weigh State agency examining medical consultant Dr. Karl Moedl's examination findings and to include limitations from his findings in her RFC assessment. (*Id.* at 17-9.) Third, Ms. Sanchez argues that the ALJ failed to develop the record regarding her borderline intellectual functioning, and failed to include all of Dr. Wynne's findings regarding her mental limitations in her RFC assessment. (*Id.* at 19-20.) The Commissioner contends that the ALJ reasonably found that through her date last insured Ms. Sanchez had the RFC to do a reduced range of unskilled light work. (Doc. 25 at 8-17.)

Assessing a claimant's residual functional capacity is an administrative determination left solely to the Commissioner. 20 C.F.R. §§ 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (stating that some issues are administrative findings, such as an individual's RFC). In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, whether severe or not severe, and review all of the evidence in the record. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. § 404.1545(a)(2) and (3). The ALJ must consider and address medical source opinions and must always give good reasons for the weight accorded to a treating physician's opinion. 20 C.F.R. § 404.1527(c); SSR 96-8p, 1996 WL 374184, at *7. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184 at *7. Most importantly, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7). When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that her RFC conclusions are not supported by substantial evidence. *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003). The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003).

### 1.    Carpal Tunnel Syndrome and Fibromyalgia

The ALJ considered the combined effect of all of claimant's medical determination impairments. Ms. Sanchez incorrectly argues that the ALJ determined that Ms. Sanchez had nonsevere impairments of carpal tunnel syndrome and fibromyalgia. (Doc. 23 at 17.) She did not. The ALJ specifically determined that

> the claimant has also alleged carpal tunnel syndrome and fibromyalgia, which has caused significant difficulty using her hands due to numbness and pain, for which she uses a brace at night, and severe fatigue. I find no conclusive diagnosis of carpal tunnel syndrome or fibromyalgia in the record, prior to the date last insured. As recently as December 1, 2014, nerve conduction studies showed no evidence of carpal tunnel syndrome or peripheral neuropathy (Exhibit 19F/4). Although there is mention of suspicion of fibromyalgia and referrals to a rheumatologist to confirm the diagnosis of fibromyalgia, there is no indication that she has followed through and as such, no confirmation of a diagnosis of fibromyalgia (Exhibits 14F/3 and 15F/2, 6). Further, she stated that she is taking Lyrica for fibromyalgia (Exhibits 23E/3); however, I see no evidence of this in the medication ledgers in her doctor's notes (Exhibits 9F and 14F/6). Accordingly, pursuant to SSR 96-4, which states that an impairment cannot be considered a medically determinable impairment based on the claimant's subjective complaints alone, without a diagnosis by an acceptable medical source, no matter how severe the claimant's subjective complaints. *Thus, I find that her carpal tunnel syndrome and fibromyalgia are not medically determinable impairments.*

(Tr. 13.) (Emphasis added.) The record supports these findings. As such, the ALJ was not required to consider Ms. Sanchez's alleged carpal tunnel syndrome and fibromyalgia diagnoses in her RFC assessment. *See* 20 C.F.R. 404.1521 (explaining that a physical or mental impairment must be established by objective medical evidence by an acceptable medical source and claimant statements about a diagnosis cannot be used to establish an impairment).

### 2.    Dr. Karl Moedl

On August 19, 2010, Ms. Sanchez presented to State agency examining medical consultant Dr. Karl Moedl for a physical exam. (Tr. 456-59.) She complained of lower back

pain that radiated down both her legs to her ankles, shoulder pain,[38] severe knee pain, and neck pain.[39]  (Tr. 456.)  She also reported she was diagnosed with hypertension and fibromyalgia,[40] and had pain "all over [her] body."  (*Id.*)  On exam, Dr. Moedl noted that Ms. Sanchez was unable to walk on her toes or heels, or squat, because of pain in her legs and severe obesity.  (Tr. 457.)  He noted that she was able to put her arms fully above her head, moving her shoulders, but that she could only hold them there for a few seconds.  (Tr. 458.)  He noted that she was unable to manipulate a small coin, but could fully extend and oppose her fingers, make a fist, and had normal grip strength and sensory function.  (*Id.*)  Dr. Moedl noted that Ms. Sanchez had a full range of motion in her lower extremities, but complained of severe pain in both knees.  (*Id.*)  He observed that she walked with a cane and limped on her right knee.  (*Id.*)   He further noted that she had chronic pain in the cervical spine and refused to test her forward or lateral flexion for fear of falling.  (*Id.*)  Finally, he noted that Ms. Sanchez complained of severe dizziness during the entire examination and was unable to stand with her eyes shut.  (*Id.*) Dr. Moedl's impressions were (1) degenerative lumbar disk disease; (2) degenerative arthritis of the cervical spine with limited motion; (3) alleged fibromyalgia; (4) degenerative arthritis of both knees; (5) morbid obesity; (6) hypertension; and (7) dizziness during the exam.  (Tr. 459.)

The ALJ properly evaluated Dr. Moedl's report as she was required to do.  The ALJ thoroughly discussed and analyzed Dr. Moedl's findings in her determination.  (Tr. 18.)  The ALJ specifically stated that Dr. Moedl did not provide a functional assessment of Ms. Sanchez's

---

[38] Ms. Sanchez reported to Dr. Moedl that she woke up one day several years ago and had severe pain in her left shoulder.  (Tr. 456.)  She stated that x-rays were taken at the time and she was told she had degenerative arthritis in her shoulders.  (*Id.*)

[39] Ms. Sanchez reported to Dr. Moedl that she believes she has "some sort of cervical disk in her neck."  (Tr. 456.) She stated that "they did recommend surgery at one time, but she refused."  (*Id.*)

[40] Ms. Sanchez reported that she was diagnosed with fibromyalgia in 2004 and "they told her the trigger point was both of her shoulders."  (Tr. 456.)

ability to do work-related physical activities, other than an inability to reach her arms above her head.[41] (Tr.18.) The ALJ observed that Dr. Moedl had no diagnostic radiologic or imaging studies to rely on in making his impressions and that he relied heavily on Ms. Sanchez's subjective complaints to form his opinion. (Tr. 18.) The ALJ also noted that x-rays of Ms. Sanchez's cervical spine demonstrated Ms. Sanchez had a normal cervical spine. (*Id.*) The ALJ further noted that Ms. Sanchez's subjective complaints were not consistent with the clinical and objective findings in the record, and in particular those of her treating physician, Dr. Ortiz. (*Id.*) The record supports the ALJ's findings.[42] (Tr. 439, 475-76, 477-78, 478, 479-80, 521.)

The ALJ's failure to assign a specific weight to Dr. Moedl's report is harmless error. The ALJ properly noted that Dr. Moedl did not provide a functional assessment of Ms. Sanchez's ability to do work-related physical activities. (Tr. 18.) Further, the ALJ was not required to assign weight to Dr. Moedl's narrative of statements by Ms. Sanchez or to Dr. Moedl's exam notes. *See generally Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (finding that the ALJ was not required to assign a weight to consultative examiner's narrative of statements relayed by claimant). The only statement that might be considered an "opinion" in Dr. Moedl's finding was that Ms. Sanchez could not reach overhead with both arms to do anything meaningful. The ALJ, however, clearly rejected Dr. Moedl's exam findings and provided explanations for doing so that are supported by substantial evidence. Thus, while the ALJ did

---

[41] Dr. Moedl noted in his exam findings that although Ms. Sanchez could put her arms fully above her head, she "really cannot reach above her head with both arms and do anything meaningful like hang a picture." (Tr. 458.)

[42] In the five months prior to Ms. Sanchez seeing Dr. Moedl, Ms. Sanchez saw her treating physician Dr. Ortiz three times. (Tr. 477, 478, 479-80.) Ms. Sanchez's only complaint was neck pain after suffering a fall. (*Id.*) Further, Ms. Sanchez denied at every appointment that she had any dizziness or focal weakness. (*Id.*) Dr. Ortiz noted on physical exam at each of these appointments that, *inter alia*, Ms. Sanchez's neck was supple and that her gait was normal. (*Id.*) In appointments in the months subsequent to Ms. Sanchez seeing Dr. Moedl, Ms. Sanchez again denied that she had any dizziness or focal weakness. (Tr. 474-75, 475-76, 511, 512-13, 534-35.) Dr. Ortiz noted on physical exams at each of these subsequent appointments that, *inter alia*, Ms. Sanchez's neck was supple, and that she had no strength, sensory or motor deficits in her upper or lower extremities. (*Id.*)

not assign a specific weight to Dr. Moedl's one finding, the ALJ's decision regarding her evaluation of his exam findings is specific enough to make clear to the Court that she rejected them. *See generally Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (finding the ALJ's decision must be specific enough to make clear to subsequent reviewers the weight given to a medical source's opinion and the reason for that weight). The Court finds no error in the ALJ's evaluation of Dr. Moedl's report.

### 3.        The ALJ Did Not Fail to Develop the Record

Ms. Sanchez argues that the ALJ failed to develop the record based on Dr. Wynne's findings that Ms. Sanchez had borderline intellectual functioning and R/O mild mental retardation. (Doc. 23 at 20.) Specifically, Ms. Sanchez argues that given Dr. Wynne's assessment of her ability to do work-related mental activities, she required a second consultative examination for valid IQ testing to determine the severity of her psychiatric impairment. (*Id.*, Tr. 378.)

The Commissioner "has broad discretion in ordering consultative examinations." *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997). A consultative examination is often required for proper resolution of a disability claim where there is a direct conflict in the medical evidence requiring resolution, or where the medical evidence in the record is inconclusive, or where additional tests are required to explain a diagnosis already contained in the record. *Id.* The regulations explain the situations that may require a consultative examination:

> We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:

(1)     The additional evidence needed is not contained in the records of your medical sources;

(2)     The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;

(3)     Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or

(4)     There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

20 C.F.R. § 404.1519a(b).

Here, the ALJ determined at step two that Ms. Sanchez's borderline intellectual functioning was severe. (Tr. 13.) The ALJ followed the special technique at step two to determine whether Ms. Sanchez's borderline intellectual functioning met or equaled the criteria of Listing 12.02 *Organic Mental Disorder,*[43] and to evaluate the severity of her mental impairment and its effect on her ability to work. The ALJ determined that Ms. Sanchez had moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.[44] (Tr. 14-15.) The ALJ concluded that Ms. Sanchez did not satisfy the "B" criteria of the Listings.[45] (Tr. 15.) The ALJ also concluded that Ms. Sanchez did not satisfy the "C" criteria of the

---

[43] Organic Mental Disorders are described as "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain . . . as evidenced by at least one of the following: 1. Disorientation to time and place; 2. Memory impairment; 3. Perceptual or thinking disturbances; 4. Change in personality; 5. Disturbance in mood; 6. Emotional lability and impairment in impulse control; or 7. Loss of measured intellectual ability of at least 15 IQ points from premorbid levels or overall impairment index clearly within the *severely* impaired range on neuropsychological testing, *e.g.,* the Luria-Nebraska, Halstead-Reitan, etc." (Tr. 489.) (Emphasis added.)

[44] The ALJ's findings are consistent with Dr. Madelyn Miranda-DeCollibus's PRT. (Tr. 498.)

[45] To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 14.)

Listings.[46] (*Id.*) Ms. Sanchez has not challenged the ALJ's step two findings. Additionally, the ALJ evaluated all the evidence in the case record, as she was required to do, and determined that despite Dr. Wynne's Axis II diagnosis, Dr. Wynne's assessment of Ms. Sanchez's ability to do work-related mental activities was not supported by the record as a whole. (Tr. 20-22.) For this and other reasons, the ALJ accorded Dr. Wynne's functional assessment little weight, and the Court has found that the ALJ's evaluation is supported by substantial evidence. *See* Section III.A.3., *supra*. Finally, Ms. Sanchez has not pointed to any objective evidence in the record, nor can the Court find any, that demonstrates the current severity of her mental impairment is not already established or that additional evidence would have a material impact on the ALJ's decision. *Hawkins*, 113 F.3d at 1167 (there must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation). The Court finds that the ALJ had sufficient information in the record to make her determination regarding Ms. Sanchez's ability to do work-related mental activities and that a second consultative examination regarding Ms. Sanchez's mental impairment was not warranted. *See Barrett v. Astrue*, 340 F. App'x 481, 487 (10th Cir. 2009) (unpublished) (finding there was no need to further develop the record because sufficient information existed for the ALJ to make her disability determination). Because the ALJ's RFC assessment properly described how the evidence supported her conclusions and her findings are supported by substantial evidence, there is no reversible error as to this issue.

---

[46] To satisfy the "paragraph C" criteria, the mental impairment must result in one of the following: 1. Repeated episodes of decompensation, each of extended duration; 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (Tr. 499.)

C.     The ALJ's Past Work Finding Is Supported by Substantial Evidence

Ms. Sanchez argues that the ALJ erred at step four because the ALJ's RFC is not supported by substantial evidence[47] and because the ALJ erred in assessing the functions of Ms. Sanchez's past work. (Doc. 23 at 22-24.) Specifically, Ms. Sanchez contends that the ALJ determined that Ms. Sanchez could perform her past job as a small products assembler as actually performed, and that Ms. Sanchez testified that her job required her to stand for eight hours thereby exceeding the ALJ's RFC for modified light work. (*Id.* at 22.) Ms. Sanchez also argues that the reasoning level for a products assembler exceeds the ALJ's mental RFC. (*Id.* at 23.) The Commissioner argues that the ALJ reasonably found that, through the date of last insured, Ms. Sanchez could do her past unskilled work and was not disabled under the Act. (Doc. 25 at 17-20.)

Claimant bears the burden of proving she cannot return to her past relevant work. *Thomas v. Secretary of Health and Human Services*, 21 F.3d 1122 (10th Cir. 1994) (unpublished) (citing *Andrade v. Secretary of Health & Human Servs.*, 985 F.2d 1045, 1050 (10th Cir. 1993)). To prove that she cannot return to her past relevant work, claimant must show that she can perform *neither* "[t]he actual functional demands and job duties of a particular past relevant job" *nor* "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Id.* (citing SSR 82-61; *Andrade v. Secretary of Health and Human Servs.*, 985 F.2d 1045, 1050-51 (10th Cir. 1993)). Said another way, Ms. Sanchez's burden is to demonstrate that she cannot return to her former *type* of work, and not just to her previous job. *Andrade*, 985 F.2d at 1052. Additionally, the ALJ

> may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion

---

[47] The Court has found that the ALJ's RFC is supported by substantial evidence and does not address this argument here. *See* Section III.B., *supra.*

volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. 404.1560(b)(2).

Here, the ALJ utilized VE Thomas Greiner to summarize Ms. Sanchez's work history and testimony and classify her past relevant work. (Tr. 59.) Mr. Greiner classified Ms. Sanchez's work as a small products assembler, DOT 739.687-030, light, unskilled, SVP-2. (Tr. 60.) The ALJ then asked the VE to

> consider someone of the claimant's age, education and past work experience with the following limitations. This person would be limited to light exertional activity as defined in the Dictionary of Occupational Titles and social security regulations so that lift/carry is 20 pounds occasionally, 10 pounds frequently. Push/pull to the extent that they can lift/carry. Sit for six hours in an eight-hour workday. Stand/walk for six hours in an eight-hour workday. Only occasionally climb ramps and stairs. Occasional stoop, kneel, crouch, crawl. Never climbing ladders, ropes, or scaffolds. This person would be limited to understand, remember, and carry out simple instructions. Would be able to maintain attention and concentration to perform simple tasks for two hours at a time without requiring redirection to task. This person would require work involving no more than occasional change in the routine work setting. And no more than occasional independent planning or goal setting. So work should be routine, repetitive and rote. Would that person be able to perform the claimant's past work?

> A.   Let me see. . . . Well, it would fit. It would fit your, it's light, constant reaching, handling, and fingering, near acuity, depth perception, the combination. And none of the other things. Nothing else.

> Q.   Okay.

A. And it's, the mental three digits are 6, 8, 7.

Q. Right.

A. Indicating routine, repetitive job with only superficial contact with anybody.

Q. Okay. Obviously, this is unskilled. So there is no, there's no question of transferability to skills.

A. Correct.

(Tr. 61-62.) The ALJ properly relied on the VE's testimony to determine that Ms. Sanchez could perform her past relevant work. (Tr. 22-23.) *See Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) (finding that an "ALJ may rely on information supplied by the VE at step four.") (quoting *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir. 1996))).

Although the ALJ stated in one part of her determination that Ms. Sanchez could return to her job "as actually performed," she also stated that Ms. Sanchez was capable of performing her past relevant work "as it is performed at the light exertional level and is unskilled." (Tr. 22.) The ALJ discussed that the VE testified according to the DOT and described that the work was performed at the light level, and was unskilled with an SVP of 2. (*Id.*) As such, the Court finds no error in the ALJ's statement of the legal standard for determining whether Ms. Sanchez could return to her past relevant work as actually performed *or* generally performed in the national economy. In conducting its review, the Court "should, indeed must, exercise common sense. The more comprehensive the ALJ's explanation, the easier [the Court's] task; but [the Court] cannot insist on technical perfection." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). Moreover, Ms. Sanchez has not demonstrated that she is unable to perform her past relevant work as it is generally performed in the national economy. Ms. Sanchez has also not demonstrated that the ALJ improperly relied on the VE's testimony regarding the small products

assembler job requirements. As such, the ALJ's step four finding that Ms. Sanchez can perform her past relevant work is supported by substantial evidence.

Finally, Ms. Sanchez argues that the job of small products assembler has a reasoning level of two which exceeds the ALJ's mental RFC. Ms. Sanchez's argument relies on Dr. Wynne's functional assessment that she would be severely impaired in her ability to persist at even simple tasks. (Doc. 23 at 23.). However, the ALJ accorded Dr. Wynne's functional assessment little weight, and the Court has determined the ALJ's evaluation of Dr. Wynne's functional assessment is supported by substantial evidence. *See* Section III.A.3., *supra*. Additionally, the Tenth Circuit has found that a limitation to "simple routine work tasks" is more consistent with jobs requiring level two reasoning. *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005).

For the foregoing reasons, the Court finds that the ALJ applied the correct legal standards at step four and that her findings are supported by substantial evidence. As such, there is no reversible error as to this issue.

## IV. Conclusion

For the reasons stated above, Ms. Sanchez's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum (Doc. 23) is **DENIED.**

_____

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**